**UNITED STATES of America,**

v.

**Charles NAUGLE, Defendant.**

**No. CR 92–815.**

United States District Court,
E.D. New York.

March 17, 1995.

Daniel J. Ollen, Parker, Ollen & Carmody, New York City, for defendant.

Tanya Y. Hill, U.S. Attorney's Office, Crim. Div., Brooklyn, NY, for U.S.

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge:

When a sentencing judge has declined to depart below the Guidelines range, the judge either believed he or she did not have the

power to depart, or chose not to exercise that power. In a number of recent cases, the court of appeals has remanded when it was not sufficiently clear from the record that the sentencing judge was aware of the power to depart. For reasons explained in this memorandum, an either-or formulation conflicts with a number of functions of the sentencing judge. Sometimes this concern for the feelings of the defendant and his family impels the judge to use language suggesting doubt where there is none.

To explain this apparent "ambiguity," which is often present, it is necessary to describe, first, how the trial court decides whether to depart and, second, how it explains that decision in the courtroom. The role of the sentencing judge requires not only that a careful decision be made, but that it be communicated in a way that acknowledges the humanity of the defendant.

## I. FACTS

Defendant Charles Naugle pled guilty to conspiring to import AK–47 rifles without State Department permission—a violation of the Arms Export Control Act, 22 U.S.C. § 2778(b) and (c). The offense carries a base level of 22, which, absent other considerations, would translate into a sentence of 41 to 51 months for a first-time offender.

At sentencing, the defendant proposed several grounds for downward departures. One was that Mr. Naugle, who is 58 years old, is the sole caretaker of his 84–year–old mother. According to documents filed with the court and uncontradicted testimony, the mother is legally blind and, after a series of strokes, requires a walker to move about and is unable to dress or feed herself. The defendant furnishes all the loving care that could be expected of a dutiful son. In his absence the mother would likely be consigned to a nursing home.

After careful consideration the sentencing judge declined to depart below the Guidelines range. Taking into account Mr. Naugle's acceptance of responsibility and his minimal role in the offense, the court sentenced him to 18 months' incarceration and three years' supervised release.

The defendant appealed from the sentence, arguing that the trial judge "clearly thought" he did not have the power to depart under the Guidelines. Brief for Appellant at 26.

A " 'trial judge's refusal to depart from the applicable Guidelines range is not reviewable, unless the record reflects that the sentencing judge erroneously believed that he lacked authority to depart.' " *United States v. Amato*, 46 F.3d 1255, 1264 (2d Cir.1995) (quoting *United States v. Zackson*, 6 F.3d 911, 923 (2d Cir.1993)) (citations omitted). Thus a finding that the sentencing court was aware of its power to depart deprives the appellate court of jurisdiction. *See, e.g., United States v. Hurtado*, 47 F.3d 577, 585–86 (2d Cir.1995); *United States v. Haynes*, 985 F.2d 65, 68 (2d Cir.1993). Noting several statements in the sentencing transcript in which the sentencing judge spoke of the departure as unwarranted, the court observed:

> This could mean that the defendant's circumstances were not as compelling as those in other cases where departures had been given and that the Judge was exercising his discretion not to depart, or that he read the cases to mean that he lacked legal authority to depart.

Order, No. 94–1356, at 2, 47 F.3d 1158 (2d Cir. Jan. 18, 1995). The court "remand[ed] to the District Court to enable the District Judge to clarify his rationale." *Id.*

In a recent opinion, the court of appeals suggested that the silence of the sentencing judge on the power to depart supports the conclusion that he or she was aware of the power to depart in that case. *See United States v. Hurtado*, 47 F.3d 577, 585 (2d Cir. 1995) ("The district court's silence on the issue does not support the inference that the court misunderstood its authority to depart."). To the extent that *Hurtado* creates a presumption that the sentencing judge appreciated the extent of his or her departure powers, it is welcome. If, however, it is viewed—mistakenly—as an inducement to sentencing judges not to discuss the matter

with the defendant at sentencing, it will seriously denigrate the proper and necessary role of the district court judge in the sentencing process.

## II. LAW

### A. The role of the sentencing judge

As the court of appeals indicated in its order, a sentencing court considering departing on the basis of "family circumstances" makes two separate decisions: whether it has the power to depart and, if so, whether it should exercise that power. These questions have often been conflated, perhaps because there are few written opinions in which judges find the power to depart, then fail to exercise it. *See United States v. Ogbondah*, 16 F.3d 498, 501 (2d Cir.1994) ("[D]istrict judges do not routinely note their understanding of the scope of their authority to depart in response to an appeal for a downward departure."); *see also United States v. Rivers*, 50 F.3d 1126, 1131 (2d Cir.1995) (noting judges' preference for rejecting departure requests "implicitly"); *United States v. Smith*, 27 F.3d 649, 665 (D.C.Cir.1994) (Sentelle, J., dissenting) (explaining how judges typically explain sentencing decisions). In fact, the two questions must be considered separately:

### B. Can the court depart under § 5H1.6?

■ The court of appeals for this circuit recognizes the power of trial judges to depart on the basis of family circumstances. *See United States v. Johnson*, 964 F.2d 124, 129 (2d Cir.1992) ("Extraordinary family circumstances are widely accepted as a valid reason for departure."). It has not limited this power to cases in which defendants care for minor children. *See, e.g., United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir.1991) (considering, in granting § 5H1.6 departure, defendant's role in caring for "disabled father—who depends on [defendant] to help him get in and out of his wheelchair—and his paternal grandmother"); *cf. United States v. Fletcher*, 15 F.3d 553 (6th Cir.1994) (approving downward departure based in part on responsibilities to elderly parents).

Under *Johnson* and like cases, the court is impelled to look not only at the crime, but at the criminal, including his or her family and community responsibilities. This is part of the sentencing court's larger obligation to consider all the facts and circumstances of the case. *See* 18 U.S.C. § 3661.

Information about family ties is always included in the presentence report. *See* Probation and Pretrial Servs. Div., Admin. Office of the U.S. Courts, Pub. No. 107, *The Presentence Investigation Report for Defendants Sentenced Under the Sentencing Reform Act of 1984*, at II–59 (1992) (instructing probation officers that "[t]he informed exercise of the court's discretionary authority demands that the presentence report include ... [i]nformation ... regarding the defendant's personal background"). *But cf.* Sharon M. Bunzel, *The Probation Officer and the Federal Sentencing Guidelines: Strange Philosophical Bedfellows*, 104 Yale L.J. 933, 966 (1995) ("Today's probation officer has been ... left in the awkward position of playing an integral role in a criminal justice system that rejects everything that the probation officer represents."). In the instant case, the section of the report labeled "Part C: Offender Characteristics, Family Ties, Family and Community Ties," contained a comprehensive description of Mr. Naugle's family life, past and present.

Often, these characteristics reveal an extraordinary family situation. If an "ordinary" family consists of a married couple caring for one or more of their minor children, then relatively few defendants who come before this court have ordinary families. This observation is borne out by data describing the statistical decline of the "traditional" nuclear family, and by burgeoning statutory and judge-made law reflecting the variety of family forms. *See, e.g.,* United States Department of Commerce, *Current Population Reports: Household and Family Characteristics: March 1993*, at v (1994) (married couples with children accounted for 36 percent of families in 1993, down from 50 percent in 1970); *id.* at x ("The structure of family households has grown complex and diverse in recent decades."); Elizabeth Shogren, *Traditional Family Nearly the Exception, Census Finds*, L.A. Times, Aug. 30, 1994, at A1 (discussing census data); Diane Crispell, *'Traditional' Families Have Thin Tradition*, Wall St. J., May 12, 1993, at B1

(same); *see also Braschi v. Stahl Assoc.*, 74 N.Y.2d 201, 544 N.Y.S.2d 784, 543 N.E.2d 49 (1989) (holding that, for purposes of rent regulation, gay couple was a "family").

Only if the sentencing judge found that a defendant's family circumstances were "ordinary" might he or she be "precluded as a matter of law from ... making a downward departure." *United States v. Sharpsteen*, 913 F.2d 59, 63 (2d Cir.1990). Every trial judge within the Second Circuit knows of the § 5H1.6 departure power. *See United States v. Ekhator*, 853 F.Supp. 630 (E.D.N.Y. 1994). *But see United States v. Ekhator*, 17 F.3d 53 (2d Cir.1994) (remanding for explicit statement that sentencing judge was aware of departure power).

### C. Should the court depart under § 5H1.6?

■ If it decides that it has the power to depart, the court must then decide whether or not to exercise that power. In making this decision, the court must consider the goals of sentencing enumerated at 18 U.S.C. § 3551 *et seq. See United States v. Concepcion*, 795 F.Supp. 1262 (E.D.N.Y.1992), *disapproved on other grounds, United States v. Deriggi*, 45 F.3d 713 (2d Cir.1995); *Deriggi*, 45 F.3d at 716 ("Section 3551 ... bids courts to consider, before they impose sentence, to what end they do so."); *id.* ("Congress expects courts preparing to sentence to reflect as they always have [on] traditional purposes of sentencing.").

In this calculus, even the most extenuating family circumstances may be outweighed by other considerations. The defendant's crime may be serious enough that, for purposes of incapacitation or specific or general deterrence, the full Guidelines sentence must be imposed.

### D. Procedure at sentencing

■ The sentencing judge may or may not write an opinion explaining his or her reasoning to the public and the appellate court. Orally, as a matter of humanity and for specific deterrence, the sentencing judge should in every case explain that reasoning at the time sentence is imposed.

Sentencing proceedings are as much dialogues as pronouncements. Under Federal Rule of Criminal Procedure 32(a)(1)(C), the court, before imposing sentence, must "ad-dress the defendant personally and determine if the defendant wishes to make a statement and to present any information." This rule requires two-way communication. Recent cases have emphasized the importance of this interaction. In *United States v. Axelrod*, 48 F.3d 72 (2d Cir.1995), the court of appeals vacated a sentence because the sentencing judge failed to explicitly apprise the defendant of his right to speak. *See also United States v. Maldonado*, 996 F.2d 598, 599 (2d Cir.1993); *United States v. Gangi*, 45 F.3d 28, 31 (2d Cir.1995) ("[D]efendant must have an opportunity to respond to the government's characterization of his post-sentencing cooperation.").

Not all the law is conducive to a free interchange between defendant and judge. The effect of a number of new sentencing statutes, the Federal Rules of Criminal Procedure, the Guidelines, and the caselaw controlling the sentencing process, taken together, is to require a stylized and complex interaction between judge and judged. See Appendix for a checklist of procedures to be followed at sentencing under the present system. As the Appendix makes clear, the sentencing judge is now constrained to follow a long list of formalities when imposing sentence. The danger is that sentencing will be performed by rote. In fact, these clerical-mechanical requirements only underscore the necessity for human interaction when sentence is imposed. It is then that the judicial system relates most powerfully to the defendant as a person.

Face-to-face contact is important to the judge, for whom pronouncing sentences without human interaction would be an unacceptable derogation of the duty to provide individualized justice. As Professor Freed has noted, the judge's belief that he is doing justice is "essential to [his or her] participation" in the sentencing process. Daniel J. Freed, *Federal Sentencing in the Wake of the Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 Yale L.J. 1681, 1687 (1992).

The requirement of face-to-face contact is also essential to the defendant, who has a right to be treated as an individual, and to know that he has been so treated. For descriptions of the need for human contact at sentencing, *see, e.g., United States v. Davern,* 970 F.2d 1490, 1516 (6th Cir.1992) (Judge Nathaniel Jones, dissenting) (sentencing is "and must remain an intensely human process"), *cert. denied,* — U.S. —, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993); *United States v. Villano,* 816 F.2d 1448, 1452 (10th Cir. 1987) (Judge Bobby R. Baldock) (sentencing, which "affects the most fundamental human rights ... should be conducted with the judge and defendant facing one another"); Hon. Lois G. Forer, *A Rage to Punish* 171 (1994) ("We can heal our criminal justice system ... only by deciding each case and imposing each sentence individually, one on one, one at a time.").

Under the present Guidelines system, only the district judge is in a position to put a human face on sentencing. Unlike their district court colleagues, appellate judges neither

> look defendants in the eye ... [n]or struggle with assessing whether an offender is beginning or ending a criminal career, appears to be dangerous or harmless, is a minnow in a sea of big fish, or has gone astray under unusually stressful circumstances and will not offend again. Appellate judges [do not see] large numbers of worried or stunned faces....

Freed, *supra,* at 1728.

Nor is such individualized justice within the mission of the Sentencing Commission. *See* United States Sentencing Commission, *Guidelines Manual* 10 (Nov. 1, 1994) (describing role of sentencing commission in formulating generalized rules); Stephen G. Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 Hofstra L.Rev. 1, 7 n. 50 (1988) (describing computer analysis of 100,000 "criminal dispositions" as basis for Sentencing Guidelines). *See also* Forer, *supra,* at 169 (1994) ("[C]ommissions can deal only with generalities and norms; they cannot act upon specific cases and actual individuals."); Editorial, *Sentencing Guidelines of the Right*

*Sort,* Judicature, Jan./Feb. 1995 at 168 (criticizing federal guidelines as both more rigid and more draconian than state sentencing systems).

Neither the once-removed court of appeals nor the twice-removed Sentencing Commission will ever see the defendant. The trial judge's use of the sentencing proceeding to make human contact is especially important in an era in which the overwhelming majority of federal prosecutions are disposed of without trial. Many defendants have no other day in court.

Remembering the human element has become increasingly important in an era of determinate sentencing laws, including statutory minimums and Guidelines, which encourage judges to think of offenders as statistics. As one judge noted, the Guidelines' "false aura of scientific certainty distances the court from the offender." Steve Y. Koh, *Reestablishing the Federal Judge's Role in Sentencing,* 101 Yale L.J. 1109, 1125 (1992) (quoting Hearings Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 100th Cong., 1st Sess. 266 (1987) (testimony of Judge Robert W. Sweet)); *see also* Richard A. Posner, *Overcoming Law* 158 (1995) (judges "should be wary of embracing totalizing visions that like Gradgrind's Benthamism in 'Hard Times' reduce individual human beings to numbers or objects").

The psychological and emotional distance between the judge and those who are in court must not be allowed to become too great. As Michael Sovern, the former president of Columbia University, reminds us, "anyone who devotes his life to helping others must believe ... that nothing here on earth is more important than appreciating the value of one human being." Michael I. Sovern, *Of Boundless Domains* 9 (1995). Events in this century have demonstrated our ability to visit the grossest injustices on people we permit ourselves to see as less than human.

## E. Significance of face-to-face contact

In Roger K. Newman's biography of Hugo Black, the author quotes Professor Charles

Reich on Justice Black's approach to the cases before him.

> Black started with people. "The first thing he saw in a case . . . was the human being involved—the human factors, a particular man or woman's hopes and suffering; this became the focus of all his compassion."

Roger K. Newman, *Hugo Black* 472–73 (1994).

The Supreme Court has noted the significance of face-to-face contact in a variety of contexts. For example, its robust right-of-confrontation jurisprudence reflects the understanding that "[i]t is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'" *Coy v. Iowa,* 487 U.S. 1012, 1019, 108 S.Ct. 2798, 2800, 101 L.Ed.2d 857 (1988). Describing a defendant as less than human is a kind of lie—one more difficult to tell in the defendant's presence. Similarly, decisions on the importance of demeanor evidence suggest the importance of tone and body language in conveying information. *See, e.g., Stein v. New York,* 346 U.S. 156, 183, 73 S.Ct. 1077, 1092, 97 L.Ed. 1522 (1953); *United States v. Shonubi,* 1995 WL 321551 (E.D.N.Y. May 24, 1995). This distinction has also been central to the Court's opinions on the public's right to observe criminal proceedings. *See, e.g., Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 597 n. 22, 100 S.Ct. 2814, 2839 n. 22, 65 L.Ed.2d 973 (Brennan, J., concurring) ("As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom.").

The sentencing proceeding is the prototypical situation in which face-to-face contact and empathy are essential. At such an encounter, the judge controls not only the language, but the manner, in which he or she speaks. At sentencing, the judge's body language and visage must convey: "I respect you as a human being and I regret having to impose this heavy sentence. None of us likes having to send anyone to prison, but that is my duty in this case."

When "family circumstances" have been raised as a ground for departure, the judge has an additional duty: to respond to what he or she sees in the courtroom, not only the defendant, but quite often family and friends, some of them visibly and audibly anguished. While stating that he or she has chosen not to grant the departure, the sentencing judge must also attempt to convey the thought: "I am aware of your importance to your family, and vice versa—I see your family members here today—but, given the seriousness of your offense, I am 'unable' to reduce your sentence."

## III. APPLICATION OF LAW TO FACTS

■ In the instant case, the trial court fully considered the defendant's family situation. It recognized that he cares for an elderly parent, and that he should be commended for assuming this role. The court, in acknowledging this extraordinary family situation, recognized that it had the power to depart. The court then considered the effects of a lengthy incarceration not only on the defendant, but on his mother. It recognized that, while in most cases the needs of a dependent child will be more compelling (since a child is in a state of development and requires adult supervision), the needs of an infirm, elderly parent may be substantial.

Nonetheless, given the seriousness of his crime, other factors outweighed the family considerations. The defendant's offense, involving international weapons smuggling, demands a lengthy term of incarceration. The courts can not ignore the great threat to stability here and abroad of illegal movement of guns. Whatever damage to Mr. Naugle's family will result from his incarceration is a consequence of his actions, not of the court's failure to consider his family circumstances.

This public "balancing of equities" had two purposes. First, the court was reviewing its decision. Second, it was indicating that it had fully considered the defendant's family circumstances. The discussion of family relationships was not about a legal question; it was about the best course to follow in this case.

A summary disposition without discussion would not have served the interests of jus-

tice. The obligation to explain decisions requires judges to analyze their decision-making—thus improving the quality of decisions. Second, a disposition lacking any indication of compassion would not provide the appearance of justice, which is a separate, and important, value in our legal system. *See, e.g., Marshall v. Jerrico*, 446 U.S. 238, 243, 100 S.Ct. 1610, 1613–14, 64 L.Ed.2d 182 (1980) (noting the importance of "preserv[ing] both the appearance and reality of fairness [because the former] generat[es] the feeling, so important to a popular government, that justice has been done") (citation omitted).

Professor Martha Nussbaum draws the following lesson from the writings of Seneca on the role of the sentencing judge:

> Seeing the complexity and fallibility of his own acts, seeing those acts as the product of a complex web of highly particular connections among original impulses, the circumstances of life, and the complicated psychological reactions life elicits from the mind, he learns to view others, too, as people whose errors emerge from a complex narrative history. [Thus Seneca chooses to] moderate his retributive zeal toward the punishment of their injustices and intensify his commitment to mutual aid.

Martha C. Nussbaum, *Equity and Mercy*, 22 Philosophy & Public Affairs 83, 104 (1993).

The sentencing judge must continue to represent an empathetic and human face of the law.

## Conclusion

The nisi prius judge alone is in the position to acknowledge the humanity of the defendant, even while imposing a harsh sentence. In the instance case, those paired goals involved acknowledging the importance of Mr. Naugle's family ties while declining to depart below the Guidelines range.

Defendant's sentence of 18 months in prison, five years' supervised release, and a $100

assessment was proper. The court had the power to depart, but declined to do so in view of the dangerous activities of the defendant.

SO ORDERED.

## APPENDIX

Checklist for sentencing

### Preliminary matters

Have defendant sworn.

Provide for interpretation, if necessary.

**READINESS FOR SENTENCE** Has the defendant read the presentence report and had it explained by counsel; is the defendant ready to be sentenced?

**MOTIONS** Are there any unresolved motions or contentions such as conflicts or dissatisfactions with representation?

**DEPARTURE** If the court is considering departure, has it given notice? If not, does the defendant or the government want an adjournment after learning of this possibility?

**GUIDELINES MANUAL** Does the defendant have the correct version of the Guidelines (and know that he or she has the right to be sentenced under the most recent version, unless that version results in a harsher sentence than the version in effect at the time of the offense)? Picking and choosing portions of each version is not authorized, under the "one-book" rule.

**DEMEANOR** If anything bearing on the court's action is revealed in the defendant's demeanor, the court should note it in the record (e.g., "The defendant seems fully aware of the nature of the proceedings, and is following closely").

**VICTIM STATEMENT** Under the victim's allocution provision of the 1994 Crime Act, a victim of a violent crime or of sexual abuse— or a relative if the victim has died or is incapacitated or a minor—is permitted to make a statement or present evidence at sentencing. This right in practice should be extended to all victims.

### Defendant's rights at sentencing

**CONTEST PLEA** Does the defendant wish to contest the plea before the magistrate judge? Check plea minutes.

**FATICO** Does the defendant wish a *Fatico* factfinding hearing? (If the parties are not prepared to proceed at once, provide pretrial order for exchange of witness lists, etc.).

**ADDRESS PERSONALLY** Does the defendant know he has the right to address the court personally?

**WITNESSES** Does the defendant know he or she has the right to put on witnesses, and to bring family and friends to court, in his or her support?

**PRE-SENTENCE REPORT** Does the defendant wish to contest anything contained in the pre-sentence report? (If so, the court should make physical changes in the report, line by line, and direct probation to make the same changes in its copy, to be supplied to the correction authorities.)

### Findings of law and fact

**PARTICULARIZED FINDINGS** The court must make particularized findings where required. For example, in conspiracy cases, the court must make findings as to whether activity was foreseeable to the defendant and the scope of the criminal behavior agreed to by the defendant.

For upward departures under § 3C1.1 (obstruction of justice), the court must make a "searching inquiry" and "independent findings" of relevant facts.

**OTHER FINDINGS** Ask: "Are there any findings of fact or law that the defendant or the government wishes the court to make?"

**CALCULATIONS** Review calculations of Probation with counsel and defendant.

**DEPARTURE** If you wish to depart, state: "I have the power to depart from the Guidelines for the following reasons among others...."

If you do not wish to depart, state: "I have the power to depart from the Guidelines, but exercise my discretion not to do so."

If you would depart but believe you lack the power, state: "I would depart for the following reasons ..., but I do not do so because I believe I lack the power under the Guidelines."

State reasons for horizontal and/or vertical departure and explicitly justify the number of steps used on the Guidelines sentencing grid.

**PLACE WITHIN RANGE** If imposing a sentence that exceeds 24 months, state the reasons for choosing the place within the Guidelines range.

**OVERLAP** If the sentence falls within either of two arguably applicable Guidelines ranges and the same sentence would have been imposed in either case, state this for the record.

### Determining the sentence

**CONCURRENCY AND SPLIT TERMS** Use Guidelines calculation for overlap and split sentences.

**CUMULATIVE PUNISHMENT** A defendant convicted of conspiracy, 21 U.S.C. § 846, and "continuing criminal enterprise," 21 U.S.C. § 848, should be sentenced only for the latter.

**OBSTRUCTION OF JUSTICE ENHANCEMENT** Enhancement for perjury requires a higher burden of proof than preponderance and involves some discretion. Do not accuse the defendant of perjury if you do not wish to enhance.

**NATURE OF INCARCERATION** Discuss the date of surrender. Provide for designation of facility as place of surrender. If relevant make recommendations re: place of incarceration, treatment programs, educational and vocational training, medical treatment, drug programs, etc.

**DEPORTATION**

1) **Judicial order of deportation** Under 8 U.S.C. 1252(a), as amended Oct. 25, 1994, the court may issue a judicial order of deportation at the time of sentencing. However, a number of procedural prerequisites must have been followed.

2) **Recommendation** It may be appropriate to state, on the record, any findings or suggestions that will be helpful to the INS.

*Also,* if defendant is to be deported, state that supervised release need not be served in this country.

**FINES AND RESTITUTION** Note that the law favors restitution. Provide for the fine. If payment is to be made over time, so state. Indicate what shall be done about interest on the unpaid balance. For both fines and restitution, the sentencing court is now discouraged from authorizing a probation officer to make post-sentencing decisions as to amount or schedule of payments. Make an affirmative statement on the record that the court considered, and made findings as to a) the amount of loss sustained by any victim as a result of the offense; b) the financial resources and ability to pay of the defendant; and c) the financial needs and earning ability of the defendant and the defendant's dependents; and d) any other factors the court deems appropriate. *See* 18 U.S.C. 3664(a). Allow anyone seeking restitution to be heard and opposed by defense counsel.

**SUPERVISED RELEASE** Impose term consistent with Guidelines § 5D1.2.

**SPECIAL ASSESSMENT** Multiply $50 by the number of counts defendant is convicted of at sentence.

*Announcing the sentence*

**IMPRISONMENT** (with recommendations)

**PROBATION** (with or without special conditions)

**FINE**

**RESTITUTION**

**SPECIAL ASSESSMENT**

**SUPERVISED RELEASE**

**DEPORTATION**

*Concluding matters*

**OTHER MATTERS** Ask: Are there any other matters the defendant or government wishes to bring to the court's attention?

**RETURN OF PROPERTY** If applicable, arrange to avoid unnecessary subsequent civil proceedings for return.

**APPEAL** Does the defendant know that he or she has the right to appeal the decision of the sentencing court? If the case was tried or a conditional plea was taken notice of a general right to appeal suffices. Will counsel take the necessary steps to protect the right of defendant to appeal and to have counsel on appeal?

**DISMISSAL OF OPEN CHARGES** (if applicable).